IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **CORPORATE LODGING CONSULTANTS, INC.,** ) ) | |
| Plaintiff, ) | |
| vs. ) | **CASE NO. 03-1467-WEB** |
| ) | |
| **BOMBARDIER AEROSPACE CORPORATION,** ) ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

Corporate Lodging Consultants (CLC) has sued Bombardier for breaching a three year contract ten and a half months prematurely without cause. CLC requests as damages approximately $107,921 in lost profits plus prejudgment interest. Bombardier Aerospace Corporation (Bombardier) counterclaims that CLC breached the contract first by failing to use its best efforts to obtain the lowest rates, by making untimely payments to hotels, and by providing low quality of hotels and poor coverage of Bombardier destinations. Defendant claims damages of $570,428.88. The Court conducted a bench trial from May 3, 2005 to May 5, 2005. The Court's findings of fact and conclusions of law are set forth below in accordance with Fed. R. Civ. Pro. 52(a). The Court's subject matter jurisdiction over the action arises under 28 U.S.C. § 1332.

**I.     FINDINGS OF FACT**

The Court makes the following findings of fact and also makes findings of fact in its analysis and discussion of the legal issues in this case.

CLC is in the business of providing hotel booking services to its clients. CLC's typical services include negotiating a lower room rate with hotels based on leverage it obtains from the high volume of

hotel stays from its approximately 250 customers.

Each of CLC's clients is issued a plastic identification/membership card by CLC.  CLC's clients are instructed to present the CLC card at check-in where the reservation has been booked at a hotel that has agreed to a negotiated rate with CLC and been approved by the client.

Hotels bill CLC for room charges incurred by CLC's clients.  After auditing and confirming or adjusting the charges on the hotel invoices, CLC adds its fee and bills its clients for these hotel stays.  In paragraph 2(d) of the Agreement, Bombardier agreed to promptly pay within seven business days of the receipt of the invoice.  (Ex. 1).  In turn, under paragraph 1(g) of the Agreement, CLC agreed to promptly disburse all payments to hotels upon receipt of payment from Bombardier.  (Id.).  Rogg and Muller both testified that most of Bombardier's payments to CLC were late.  (Ex. 16-20, 251).  There is evidence that hotels were paid late by CLC.  (Ex. 97, 151).

Bombardier is in the business of providing fractional ownership interests in aircraft to its customers.  Bombardier refers to this business as "FlexJet".  Through its FlexJet program, Bombardier provides its customers the aircraft, crew, maintenance, fuel, and supplies.  The private aircraft in the FlexJet program do not maintain regular routes or scheduled departures.  FlexJet is a custom program designed to allow its customers maximum flexibility for travel arrangements, including travel time, destination, and convenience.  FlexJet fractional owner customers can travel to any destination throughout the world at any time.

On May 8, 2001 CLC and Bombardier entered into a System Lodging Agreement (Agreement).  Bombardier utilized the services of CLC under the Agreement to obtain lower rates for hotel stays for aircraft crew required to stay overnight with a FlexJet fractional customer.  CLC

negotiated with hotels and proposed to Bombardier those hotels to be added to the system. Bombardier had the right to approve any such hotels to be included in the system.

In paragraph 1(a) of the Agreement, CLC contracted to use its best efforts to locate hotels with favorable rates and otherwise satisfactory to Bombardier in locations as required. (Id.). In paragraph 1(e) of the Agreement, CLC contracted to use its best efforts to negotiate and obtain the lowest hotel rates for Bombardier and to provide Bombardier monthly savings reports identifying the savings to Bombardier each month. (Id.). In paragraph 2(f) of the Agreement, Bombardier agreed to pay CLC $4.441 per hotel night in a contracting hotel for its services. (Id.). Bombardier's total needs for FlexJet crew lodging were approximately 4,000 room nights per month. The Agreement became effective June 11, 2001 and was for a three year term.

In paragraph 3 of the Agreement there is a clause that allows either party to cancel upon 30 days written notice for cause. Cause was defined as "occurrences where:

1) CLC abandons the work or delays in performance of the lodging services for an unreasonable length of time, and/or:

2) Either party breaches or fails to comply with any of the provisions hereof." (Id. 1 ¶ 3).

In paragraph three of the Agreement, another cancellation clause states that during the fourth month, if CLC has not saved Bombardier at least ten percent during the prior month, Bombardier may cancel within thirty days. (Id.).

After the Agreement was signed, Kyle Rogg (Rogg), the Vice President of Customer Operations for CLC, testified that CLC began building a customized network of hotels for

Bombardier's flight crews. He testified that CLC increased the number of hotels at Bombardier's destinations (called penetration or coverage) from roughly 20 percent the first year of 2001 and improved each year after that to approximately 50 percent in 2002 and finally to 82 percent in 2003.

Sheila Tucker (Tucker), a CLC contract negotiator, testified that CLC negotiated new rates and added new properties to increase savings to Bombardier throughout the life of the contract. (Ex. 242, 243, 244). For example, on February 6, 2002, CLC negotiated with the Courtyard Hotel to lower its rate from 115 to 98 dollars and on February 27, 2002 CLC negotiated with the Holiday Inn to lower its rate from 104 to 99 dollars. (Ex. 242). Additionally, there are numerous exhibits from the year 2002 and early 2003 showing communication between Bombardier representatives and Tucker regarding rate adjustments, complaints, property changes and other issues. (Ex. 84-123, 125-223).

The custom hotel network CLC created was based on rates CLC negotiated with hotels that met certain criteria established by Bombardier. The criteria established by Bombardier for the hotels included cleanliness, inside corridors for security, restaurants within or near the hotel, proper environment for day or night rest and distance to the airports and fixed base operations of the owner's various destinations.

At the time the Agreement was entered into, Bombardier was using a travel agency, Carlson Wagonlit Travel (Carlson), to coordinate the reservation of hotels for Bombardier. Bombardier allowed Carlson to access CLC's customized network of hotel rates. The relationship between Carlson and Bombardier terminated in January 2003 and a different travel agency, Rosenbluth, commenced booking hotels for FlexJet crews.

To effectively re-negotiate rates due to a higher volume of stays or improve coverage in a new

area, CLC needed to know on a timely basis at which hotels and how many nights the FlexJet crews were staying. Julie Muller, Flexjet's travel manager, testified that hotel rates are highly variable and current information regarding location of stays and rates is important. Bombardier's booking reports contained this information and they were provided regularly to CLC from Carlson.

Once Rosenbluth took over duties as travel agent for Bombardier, booking reports were belatedly provided. Rogg testified that despite repeated requests, Bombardier did not provide booking reports for the period of February to April 2003 until May 16, 2003. (Ex. 29). Muller testified that this long delay was the result of an "operational stabilization" period that Rosenbluth needed to get computers, software and personnel in the new capacity as travel agent.

Muller testified that when Rosenbluth became the travel agent, Bombardier and Rosenbluth began to set up a pilot program to test the market and the efficacy of CLC's services. Rosenbluth sent out requests for hotel rates and Muller compared these to CLC's rates. Rosenbluth had access to CLC's negotiated rates but CLC was not informed of the results of Rosenbluth's efforts to negotiate rates. Rogg testified that CLC requested that Bombardier have Rosenbluth sign a non-disclosure agreement. (Ex. 25, 27). Muller states she passed on the non-disclosure agreement to Rosenbluth but there is no documentary evidence of this. Rosenbluth never signed the non-disclosure agreement.

CLC provided monthly savings reports to Bombardier which listed the city, hotel, number of nights, the CLC rate, the base rate and the savings. Rogg testified that the savings reports showed monthly savings from ten to thirty percent for each month during the life of the contract. (Ex. 244).

Under paragraph 1(i) of the Agreement, the monthly savings report was calculated by subtracting the current (CLC) rate from the base rate for each night stayed at a CLC contracted hotel.

(Ex. 1). Base rates are also defined in the Agreement. Base rates are either: 1) the amount Bombardier paid immediately prior to contracting with CLC; or 2) if it is a new hotel and there was no previous hotel rate paid by Bombardier, the base rate would be the midpoint of the published FBO (fixed base operations) rates[1]. There is no documentation of complaints about the format or the content of the savings report. Muller testified that the savings reports were done in a manner consistent with the Agreement.

In a telephone call on May 27, 2003 Muller and Bombardier's Director of Customer Service Procurement, Michael Trainor, threatened Rogg that if CLC did not improve coverage and lower rates, Bombardier would have to seriously reconsider its relationship with CLC.

One option CLC provided Bombardier in the two weeks following the May 27, 2003, call was to negotiate lower rates for the hotels with whom CLC currently had deals. Another was to allow CLC to book with properties having lower rates than current hotels. The total savings for these proposals would have amounted to $233,000 of savings annually. (Ex. 36). While CLC did not need Bombardier's permission to implement re-negotiated rates at existing hotels, Bombardier's permission was required to add a new lower rate hotel to their network. (Ex. 1). Muller testified that she did not analyze or respond to any of CLC's savings proposals and specifically Muller did not approve any of the new hotels to be added to the system.

On June 11, 2003, Rogg had another phone conversation with Mike Trainor and Muller to explain the proposals for savings. He offered to meet to discuss any other options for improving the

---

[1] The FBO is a standard guide to the various rates offered by hotels to different customers such as corporate, flight crews, truckers etc.

program. On July 2, 2003, Muller, on behalf of Bombardier, wrote a letter to CLC terminating the Agreement.

Muller testified that she expected 100 percent coverage of Flexjet's destinations; however, there is no pre-termination document or communication record showing that this was communicated to CLC. Muller testified that it was an unspoken requirement; however, Muller also testified that she had no knowledge of the parties' coverage expectations at the time of the Agreement as she only became involved with CLC after May 2002. Rogg's testimony and an e-mail show that in 2002, Scott Thorpe, (Bombardier's operational point of contact) discussed with Rogg about obtaining a coverage goal of 75 percent.

Muller's letter states that Bombardier no longer believes that CLC has used its best efforts nor will CLC use its best efforts in the future to secure the most competitive hotel rates. The letter also ambiguously states that "other problems" are also a reason for termination. Muller elaborated at trial stating that Bombardier was dissatisfied that CLC's cards were at times not accepted by hotels, the hotels were sometimes not timely paid, the hotels were of poor quality, that CLC did not compel hotels to load rates onto a universal computer system and that coverage was below 100 percent. Bombardier provided numerous exhibits showing complaints about these problems. (Ex. 83, 105-110, 112-114, 125-225). The termination became effective at the end of the day August 1, 2003.

Credibility determinations were made by the Court when evaluating the various factual issues. Rogg and Tucker were both credible. Their answers were direct and forthright even on questions that produced unfavorable answers for CLC.

**II.     CONCLUSIONS OF LAW**

A federal court sitting in diversity jurisdiction applies the substantive law and the choice of law provisions of the forum state, which in this case is Kansas. *Missouri P.R. Co. v. Kansas Gas & Electric Co.,* 862 F.2d 796, 798 n1 (10th Cir. 1988). When analyzing choice of law with respect to contract construction, Kansas applies the rule of lex loci contractus (ie., the place of the making). *Id.* The Agreement was made in Wichita; therefore, the Court will apply Kansas law.

The parties agree that the System Lodging Agreement was a valid contract between CLC and Bombardier. Bombardier argues that in interpreting the contract, the Court should construe it against the drafter, which in this case is CLC. However, the Court finds that the intent of the parties is ascertainable from the four corners of the Agreement; therefore, it is not ambiguous and there is no need to construe any particular term against the Plaintiff. *Amoco Prod. Co. v. Charles B. Wilson, Jr., Inc.,* 976 P.2d 941, 945, 266, Kan. 1084, 1088 (1999). The facts have been found by the Court and the interpretation of the contract and its legal effect are matters of law. *Id.*

Bombardier argues that the early termination of the contract was justified because CLC failed to use its best efforts. The Kansas Supreme Court has stated that best efforts "create[s] a standard of conduct for [a party's] performance under the Agreement above and beyond the implied obligation of good faith." *T.S.I. Holdings v. Jenkins*, 924 P.2d 1239, 1250, 260 Kan. 703, 720 (1996).

> Another term that courts often supply is one imposing a duty of 'best' or 'reasonable' efforts. Such a duty requires a party to make such efforts as are reasonable in the light of that party's ability and the means at its disposal and of the other party's justifiable expectations. Although the scope of this duty is no better defined than is the scope of the duty of good faith, it is clear that the duty of best efforts is more onerous than that of good faith.

>...
>Best efforts is a standard that has diligence at its essence...

*Id.* (quoting Restatement (Second) of Agency § 13, comment a (1957)).

Bombardier states that CLC failed to use its best efforts to obtain the lowest and most competitive hotel rates for the Flexjet program. The evidence does not support such a conclusion. CLC consistently re-negotiated rates at existing hotel properties to expand coverage and added other properties to the hotel network to lower costs. The trial testimony and evidence shows the positive results of those efforts. CLC saved Bombardier each month at least ten percent and sometimes over thirty percent on hotel rates. Paragraph three of the Agreement is instructive. The clause states that Bombardier may cancel during the fourth full month of the agreement if at least ten percent savings was not realized in the prior month. This shows that the parties intended ten percent, at least, to be a reasonable expectation of savings. Bombardier never complained that the savings were not substantial until May of 2003, after Bombardier had begun developing their pilot travel program with Rosenbluth. The Court finds that CLC's actions were commensurate with their ability and means and that CLC complied with the best efforts requirement in the Agreement with respect to obtaining lowest rates.

Next, Bombardier argues that CLC breached the Agreement by failing to promptly disburse payments to hotels, causing some hotels to refuse Defendant's flight crews rooms at CLC rates. Bombardier presented no evidence that the late payments were caused by CLC's lack of diligence or best efforts. While CLC had a contractual duty to pay the hotels on time, this duty only matured once Bombardier fulfilled its duty to pay CLC for those hotel stays. The evidence shows that Bombardier was consistently dilatory in paying CLC's invoices for hotels stays. Therefore, Plaintiff did not breach

9

the Agreement by failing to pay certain hotels in a timely manner.

Bombardier next argues that CLC failed to use its best efforts to obtain adequate hotel coverage at Flexjet's destinations. Muller testified that she expected a 100 percent coverage rate. This 100 percent coverage figure is not mentioned in the contract nor did Muller communicate this expectation to CLC prior to termination. Given these facts, plus the myriad of Flexjet's potential destinations in North America, the Court finds that 100 percent coverage is not a justifiable expectation of best efforts. Communications in 2002, between Rogg and Bombardier, show an agreement that 75 percent was a reasonable goal, indeed it was a goal that CLC exceeded the following year. The evidence shows CLC's continuous progress in increasing the hotel coverage. During the first year of the Agreement, there was coverage of over 20 percent; in 2002, that number increased to over 50 percent and finally in 2003, the coverage improved to 82 percent. The Court finds that this evidence shows that CLC used their best efforts and improved coverage over the life of the Agreement.

Next, Bombardier argues that CLC failed to use its best efforts to locate hotels satisfactory to Defendant. Tucker acknowledged the complaints about hotel quality and testified that she responded promptly and contacted the substandard hotels to remedy the situation by either receiving assurances of change from the hotel or by changing properties. In total, Bombardier introduced around 24 complaints regarding their dissatisfaction with hotel quality. (Ex. 83, 94, 98, 100, 105, 109, 114, 127, 135, 159, 162, 162, 166-168, 176, 177, 187, 202, 206, 209, 212, 214, 215). However, Bombardier had roughly four thousand hotel stays per month over the life of the 26 month Agreement and when placed in that context, the number of complaints is small in proportion to the number of total hotel stays. The Court finds that occasional complaints, coupled with a high volume of hotel stays, is reasonable and

does not reflect a breach of duty to use best efforts.

Bombardier next argues that some hotels would reject the CLC card causing defendant's crew members to pay higher rates. The Court has already discussed how late payments from Bombardier were the likely cause of late payments to hotels. However, Muller testified that there were other reasons why the hotels did not accept CLC's cards, including contract cancellation and hotel staff ignorance. Even assuming *arguendo* that these issues were CLC's fault, it still does not show a lack of diligence or best efforts. Again, the evidence shows around 50 documented complaints regarding hotels failing to accept the CLC card; however, given the approximately 4,000 rooms per month stayed at by Flexjet, 50 complaints over the 26 months of the Agreement amounts to around one percent of the hotels stays. (Ex. 82, 91, 95, 97, 100-102, 107, 108, 110, 112, 113, 117, 120, 123, 126, 128-132, 136-138, 140, 144-146, 150, 155, 164, 178, 179, 181-183, 186, 188, 189-192, 199, 207, 213, 221, 224). Best efforts does not mean perfection and expectations are only justifiable if they are reasonable. The number of complaints are reasonable given the breadth of the Flexjet program and they do not reflect a breach of best efforts or lack of diligence.

Bombardier next argues that Plaintiff breached the Agreement by failing to cause contracting hotels to load CLC's rates into a universal computer system. The result was that Bombardier's booking agent, Carlson and later Rosenbluth, had to place time-consuming phone calls to the hotel to book stays. No where in the four corners of the contract is there an obligation for CLC to cause hotels to load rates onto a computer system. This requirement cannot be read into the Agreement *post factum*. CLC was under not contractual duty to compel hotels to load rates onto the computer system; therefore a failure to do this does not constitute a breach.

Bombardier finally argues that Plaintiff breached the Agreement by failing to provide them with accurate savings reports. Bombardier has provided no evidence that the savings reports were misleading or inaccurate in any way. In fact, Muller testified that the savings reports were consistent with the calculations set out by the Agreement.

None of the reasons elucidated by Bombardier show a breach of the Agreement by CLC. The record shows it was Bombardier who wrongfully breached the Agreement by prematurely terminating the contract without cause ten and half months early.

### *Damages and Prejudgment Interest*

Kansas has long followed the rule of *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng. Rep. 145, 5 Eng. Rul. Cas. 502 (1854), which states that breach of contract damages "are limited to those damages which may fairly be considered as arising in the usual course of things, from the breach itself, or as may reasonably be assumed to have been within the contemplation of both parties as the probable result of the breach." *Kansas State Bank v. Overseas Motosport, Inc.*, 563 P.2d 414, 415, 222 Kan. 26, 27 (1977).

Plaintiff calculated damages by using the number of rooms booked by Rosenbluth in the ten and half months left in the contract and multiplied that by 82 percent (the latest coverage figure) and then multiplied that by their $4.41 fee. After subtracting for overhead expenses, the Court agrees with Plaintiff that they have suffered $107,921 in compensable lost profits.

Plaintiff also argues that it is entitled to recover prejudgment interest on the lost profits at a rate of ten percent per annum from a date of seven business days after the end of each month. Prejudgment interest is governed by Kan. Stat. Ann. § 16-201 which states:

> Creditors shall be allowed interest at the rate of 10 percent per annum...for any money after it becomes due; for money lent or money due on settlement of account, from the day of liquidating the account and ascertaining the balance; for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts...

Id.

A claim becomes liquidated when both the amount due and the date on which it is due are fixed and certain, or when the same becomes definitely ascertainable through mathematical calculation. *Kilner v. State Farm Mut. Auto Ins. Co.,* 847 P.2d 1292, 252 Kan. 675, 686-687 (1993).  The Court holds that Plaintiff's damages are measurable as the contract clearly states a fixed fee and the date those fees are due.  The number of rooms booked by Rosenbluth in the remaining ten and a half months of the contract is quantifiable.  The 82 percent coverage was the latest figure in 2003.

In the alternative, the Court also finds that the principles of equity mandate a finding for prejudgment interest for CLC.  An exception to the above statute exists.  "[W]here necessary to arrive at full compensation, a court may in the exercise of its discretion award interest or its equivalent as an element of damages even where the primary damages are unliquidated." *Koch v. Koch Indus., Inc.*, 996 F. Supp. 1273, 1280 (D. Kan. 1998) quoting *Henderson v. Hassur*, 594 P.2d 650, 660, 225 Kan. 678, 689 (1979).  Had Bombardier not wrongfully breached the Agreement, CLC would have reaped and had access to their profits; therefore, prejudgment interest is necessary to fully compensate CLC.

The Court holds that Plaintiff is entitled to recover prejudgment interest under the statute and

under equitable considerations in the amount of $13,984.49.[2]

## III.  CONCLUSION

In accordance with the above Findings of Fact and Conclusions of Law, it is ordered and adjudged that Plaintiff Corporate Lodging Consultants, Inc. shall recover of Defendant Bombardier Aerospace Corporation the sum of $121,905.49.

It is further ordered that Defendant Bombardier shall take nothing on its counterclaim against Plaintiff CLC; and said counterclaim is dismissed on the merits.

 The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED this 11th  day of May 2005, at Wichita, Ks.


s/ Wesley E. Brown

Wesley E. Brown, U.S. Senior District Judge

---

[2] The statutory rate of 10 percent was divided by 12 to get a monthly rate which the court then multiplied by the number of months from when each monthly sum of lost profits was owed.